IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALFRED LEE BRANUM, | § | |
| TDCJ-CID NO.286354, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-02-4559 |
| | § | |
| ALAN CHAMBLESS, *et al.*, | § | |
| Defendants. | § | |

<u>OPINION ON DISMISSAL</u>

Plaintiff Alfred Branum, an inmate incarcerated in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID"), has filed a civil rights complaint (Docket Entry No.1), several supplemental complaints (Docket Entries No.8, No.11, No.18, No.27,), several briefs in support of his complaints (Docket Entries No.2, No.4, No.12, No.13), and two responses to the order for a more definite statement (Docket Entries No.19, No.20) pursuant to 42 U.S.C. § 1983, alleging that TDCJ-CID officials denied him adequate medical care and housing and retaliated against him for filing grievances. The Court denied plaintiff's motion for partial summary judgment and dismissed several defendants from the suit because plaintiff's claims against them were frivolous or unexhausted. (Docket Entry No.85). Pending is defendants Alan Chambless, Steve Karakos, Fred Becker, Ruth Hearne, Cresia Howard, Luke Scamardo, Lisa Vatani, and Eugene Fontenot's Motion for Summary Judgment (Docket Entry No.118) and plaintiff's motions a) to order show cause why a preliminary injunction should not issue and for a temporary restraining order (Docket Entry No.122); b) for leave to file an amended complaint (Docket Entry No.133); and c) to object to defendants' expert witness. (Docket Entry No.136. Plaintiff has also filed a response to the motion for summary judgment. (Docket Entry No.129).

For the reasons to follow, the Court will grant defendants' motion for summary judgment and deny plaintiff relief.

## I. BACKGROUND

Plaintiff reports the following with respect to his claims pending against defendants:

Plaintiff is wheelchair bound and suffers from chronic liver disease.  His right foot has been amputated and he cannot wear a shoe or a prosthetic device because of a skin condition.  On June 16, 2002, while bathing in a handicapped shower on number 14 dorm of the Jester III Unit of TDCJ-ID, plaintiff suffered an injury to his left testicle after it became lodged between the open-ended slats on the shower bench.  An incident report was filed and plaintiff was seen by medical personnel at the unit.  He was transferred shortly thereafter to the Pack I Unit.

On June 27, 2002, plaintiff arrived at the Pack I Unit.  He put in a sick call request complaining of pain in his testicle and his back, and of a draining hole in his leg.  On July 2, 2002, plaintiff was seen by Dr. Boultinghouse via Tele-Med, who prescribed Bactrim, a sulfa drug, for the leg wound, and referred him to the unit provider for the genital and back problems.  Within days, plaintiff had an allergic reaction to the drug, which included chills, fever, vomiting, and hallucinations.  An abscess formed in the vein of plaintiff's foot and old scars reopened.  A few days later, plaintiff saw the Unit physician, Dr. Luke Scamardo, who told him to stop taking the drug and ordered dressing changes for the wounds.

Plaintiff also complained to nurses at the Pack I Unit that he was experiencing back pain but he was denied an egg crate mattress.

In August, Dr. Scamardo referred plaintiff to a urologist for his testicle injury.  Plaintiff was seen by the urologist on October 16, 2002, via Tele-Med and medication was prescribed.

Surgery was performed on the testicle on January 10, 2003.  In early April of 2003, a doctor from the University of Texas Medical Branch in Galveston, Texas, ("UTMB") told plaintiff that his bladder was not functioning properly and instructed him to wear an indwelling non-latex catheter

2

because plaintiff is allergic to latex.  Notwithstanding the instruction, the Pack I medical staff provided plaintiff with a latex catheter in late April.  Within two days, plaintiff had an urinary tract infection.  In May of 2003, after several follow-up visits to UTMB, Dr. Sharpe, a urologist, told plaintiff, via Tele-Med, that plaintiff's bladder was no longer functioning, most likely because of the testicle injury.

Plaintiff claims that he continues to experience a discharge from his penis around the catheter.  He also continues to experience loss of bladder and reproductive function.  Plaintiff may face another surgery to move the catheter tube to another location.

Plaintiff seeks compensatory and punitive damages and injunctive relief on the following claims:

1.    Jester III Unit personnel Maintenance Supervisor Allen Chambless and Maintenance Craftsman Steve Karakos, Unit Risk Manager Ruth Hearne, former Warden Fred Becker were deliberately indifferent to his safety because they were aware of the design defect of the shower bench and yet failed to have it repaired; and,

2.    Doctors Luke Scamardo and Eugene Fontenot, Nurse Cresia Howard, and Physician's Assistant Lisa Vatani were deliberately indifferent to his serious medical needs.

Defendants move for summary judgment on the following grounds:

1.    Plaintiff has failed to exhaust his administrative remedies with respect to some of his claims against defendants Howard, Fontenot, and Vatani;

2.    Defendants Howard, Scamardo, Fontenot, and Vatani were not deliberately indifferent to plaintiff's serious medical needs;

3.    Defendants are entitled to Eleventh Amendment immunity;

4.    Plaintiff cannot overcome defendants' entitlement to qualified immunity; and,

5.    Plaintiff fails to allege facts demonstrating the personal involvement of defendant Becker.

II. <u>DISCUSSION</u>

3

A. <u>Summary Judgment</u>

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). To survive a properly supported motion for summary judgment, a section 1983 plaintiff must demonstrate, in light of "the substantive evidentiary standard of proof that would apply at the trial on the merits," that "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

B. <u>Non-Exhaustion of Claims</u>

Defendants contend that plaintiff's claims against defendants Howard, Fontenot, and Vatani should be dismissed because he failed to exhaust his administrative remedies before filing suit.

Section 1997(e) of 42 United States Code, as amended by the Prison Litigation Reform Act, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e); *Booth v. Churner*, 532 U.S. 731 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

4

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The Texas Department of Criminal Justice-Correctional Institutions Division currently provides for a grievance procedure for presenting administrative grievances.  *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999).  "The Step 1 grievance, which must be filed within fifteen days of the complained-of incident, is handled within the prisoner's facility.  After an adverse decision at Step 1, the prisoner has ten days to file a Step 2 grievance, which is handled at the state level." *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  To exhaust, a prisoner must pursue a grievance through both steps. *Wright*, 260 F.3d at 358.  A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired. *Powe*, 177 F.3d at 394.

### 1. Eugene Fontenot and Lisa Vatani

Plaintiff claims that a UTMB urologist ordered plaintiff to wear a non-latex catheter because plaintiff is allergic to polyurethane and that Dr. Eugene Fontenot noted the allergy in plaintiff's medical records.  Notwithstanding the order, Physician's Assistant Lisa Vatani refused to remove plaintiff's latex catheter and replaced it with a non-latex catheter on April 25, 2003, because the unit medical director and nursing manager expressed concern about the expense of a non-latex catheter.  Thereafter, on April 30, 2003, Dr. Fontenot conducted an experiment to determine if plaintiff was allergic to latex by placing plaintiff's hand in a latex glove for thirty minutes.  Fontenot noted on plaintiff's medical chart that plaintiff's hand was reddened, but he was not allergic to latex.  Plaintiff claims he began to experience a burning, itching discharge from his penis the day after he was forced to use a latex catheter.  On May 30, 2003, Physician's Assistant Vatani ordered that

plaintiff's latex catheter be changed once a month instead of twice a month, even though other inmates changed their latex catheters twice a month.

Plaintiff did not file a grievance against Vatani on the claim that she refused to insert a non-latex catheter on April 25th.  He did file grievance number 2003163995 on May 14, 2003, against the medical department and Ms. Mason, in which he complained that the UTMB specialist said he was allergic to latex.  He did not, however, mention defendant Vatani or the April 25th claim in the grievance.  (*Id.*, Appendix L at 51-55).  Accordingly, plaintiff's claim that Vatani was deliberately indifferent to his serious medical needs by refusing to supply him with a non-latex catheter on April 25, 2003, is unexhausted and will be dismissed pursuant to 42 U.S.C. § 1997(e).

On June 24, 2003, plaintiff filed Step One grievance number 2003176601, complaining that he was forced to wear a latex catheter instead of a silicone one.  He also complained of Dr. Fontenot's experiment with the latex glove but he made no mention of Physician's Assistant Vatani or of the frequency change from twice a month to once a month.  He received a response to the grievance on July 3, 2003, which stated that Nurse Bernal had indicated that "[t]he catheter frequency change was ordered by Hospital Galveston Urology to once a month.  It was not changed by me or the P.A." (Docket Entry No.118, Appendix L at 61-62).  Although defendants indicate that no Step Two grievance was found in TDCJ-CID records, plaintiff attached a copy of the Step Two grievance to his Brief in Opposition to Memorandum and Order on Partial Dismissal.  (Docket Entry No.91, Attachment).  In the Step Two grievance, plaintiff complained that Vatani, among other medical personnel, told him they did not have to follow the orders of UTMB specialists and that his medical print-out shows that Vatani ordered the frequency change.  (*Id.*).  The response, dated July 31, 2003, stated the following:

> Review of Health Services records reveals your concerns referencing the clinical decision made, as well as, allegation of being allergic to latex are redundant and were

previously addressed by Step 2 Reference Offender Grievance 2003163995.  Review
of clinical record documentation reveals that the facility medical department has
continued to monitor your concerns for an alleged latex allergy.  You are scheduled
for a follow-up Urology video specialty August 2003.  If you believe that your
medical condition warrants evaluation, you may wish to submit a Sick Call Request
to the facility medical department.  No action is warranted through the grievance
mechanism.

(*Id.*).

Even though plaintiff addressed numerous issues in grievance number 2003176601, he gave

fair notice to TDCJ-CID officials of his complaint regarding Dr. Fontenot's latex glove experiment.

*See Johnson*, 385 F.3d at 503.  Accordingly, the Court finds that plaintiff exhausted his claim

regarding the latex glove test against Dr. Fontenot.  Therefore, defendants' motion for summary

judgment on this issue will be denied.

The Court further finds that plaintiff gave fair notice of his complaint that Vatani ordered

the catheter change.  The record shows that plaintiff filed Step One grievance number 2003181403

on June 10, 2003, complaining that Vatani ordered the catheter frequency change, but he did not file

a Step Two grievance.  (*Id.*, Appendix L at 63-65).  Plaintiff did not file a Step 2 grievance but filed

a medical grievance.  (Docket Entries No.139, Plaintiff's Brief in Opposition to Defendants' Motion

for Summary Judgment at 9, No.130, Appendix J, J1).  In response, plaintiff was informed that the

catheter frequency change to once a month was ordered by the urologist at the hospital in Galveston.

(Docket Entry No. 130 at J).  On July 2, 2003, he filed Step One grievance number 2003195907

against Vatani and other medical personnel, in which he complained of the frequency of the catheter

change.  He received a response in early August of 2003, which indicated that the frequency of a

catheter change was based on the person's medical condition.  (*Id.*, Appendix L at 66-68).  Plaintiff

filed a Step Two grievance on August 13, 2003, which was denied.  (*Id.* at 69-70).  Although the

exhausted grievances were filed untimely with respect to the May 25, 2003, medical appointment

with Vatani, TDCJ-CID officials did not dismiss the grievances on this procedural ground, but addressed the merits of the complaint.  For this reason, the Court concludes that plaintiff exhausted his administrative remedies regarding the catheter change.

Defendants, nevertheless, complain that plaintiff did not file grievances against Vatani, and Fontenot until after he filed suit and therefore, did not exhaust his administrative remedies under 42 U.S.C. § 1997(e).  Defendants fail to acknowledge that the Court allowed plaintiff to supplement his original complaint with claims against Fontenot and Vatani, which were non-existent at the time he filed his original complaint.  For this reason, plaintiff could not have exhausted his administrative remedies before filing the present suit.  Plaintiff exhausted his administrative remedies against defendants Fontenot and Vatani before supplementing his original complaint.

## 2. Cresia Howard

Defendants next contend that plaintiff did not exhaust his administrative remedies with respect to the following complaints against Licensed Vocational Nurse Cresia Howard:

On July 10, 2002, plaintiff went to the medical clinic with a pass issued by a doctor for a shot.  He was being treated for a severe reaction to Bactrim and was still experiencing the side effects of the drug.  Plaintiff claims Howard called him a liar and told him to leave the clinic and not to return until he got a lay-in.  She threatened to write a disciplinary report if he returned.

The record reflects that plaintiff filed Step One grievance number 2002203138 on July 17, 2002, complaining that a nurse turned him away from the clinic on July 8th as follows:

On 7-07-02 I got real sick vomiting with a temp. of 104.7.  I seen [sic] the 10-6 shift nurse[;] she said the Dr. told me to return at 4:45 am[.] I did and after examination and shots Dr. Scamardo sent me back to my dorm with instructions to return if I kept vomiting and he'd send me to Galveston.  At about 10:30-11:AM [sic] on 7-8-02 I returned to medical as per doctor['s] orders.  I was told by a nurse I could not come into medical that the doctor did not tell me that and the doctor was done. (The doctor has already advised me not to take the antibiotic because I was having an allergic

8

reaction to it)[.] The nurse told me that I have an antibiotic to go back to my dorm take my medication and return the next morning for my appointment.

(Docket Entry No.5, attachment).  The response to the grievance signed by E. Carmona on August

21, 2002, stated the following:

> Per Dr. Scamardo, Offender Branum received treatment consistent with his objective assessment and condition.  There is no documentation to substantiate Offender Branums' [sic] claims.  #1- The antibiotic sulfamethoxerol was ordered by DMS Dr. Boulting house [sic] on July 2 and the patient started taking it July 5th.  #2 Ther [sic] is no documentation regarding a July 8th encounter with any medical department employee.  #3 Dr. Scamardo documented on July 10th "developing fever, chills, rash, nausea and vomiting yesterday", [sic] which would have begun July 9th.  The patient[']s temperature was 101.8 not 104.7.  #4 Dr. Scamardo informed me that he did not mention referral to Hospital Galveston for Offender Branum because there was no medical indication for a referral."

(Docket Entries No.118, Appendix L, pages 9-10, No.130, Appendix D-2).  Although defendants'

records do not show it, plaintiff filed a Step Two grievance on August 22, 2002, recounting the same

chronology regarding the initial visit to the clinic, his appointment with Dr. Scamardo and the

symptoms that he was experiencing.  He further stated the following in the grievance:

> Also Dr. Scamardo did say that if the lab technician could not start an I.V.[,] he would send me on "up."  Then when I left[,] he did tell me to return if I was still vomiting in 3-4 hours and he would send me "up" to Galveston.  Several of the 3rd and 1st shift L.V.N.'s and medical staff know of this.  Ms. Howard turned me away at the door[.] Nurses only know of my return.

(Docket Entries No.5, attachment, No.130, appendix D-6 through 7).  The response to the Step Two

grievance, signed by Rochelle McKinney on September 10, 2002, stated the following:  "The

response provided at Step 1 does not appear to accurately address your action requested, therefore,

your delayed access to care concern for treatment of a medication reaction has been referred for

official review.  No additional action is warranted through the grievance mechanism."  (*Id.*).

A grievance report from the Health Services Division dated October 9, 2002, states the

following:

Offender Branum alleges Crawford, LVN evaluated him, but denied medical treatment for a possible allergic reaction to the above-mentioned medication on 7-8-02 at 11:15 pm. [sic] Review of the Sick Call Visits Register for this date supports Offender Branum signed into medical at 11:40 pm [sic] on 7-8-02 and out on 12:10 pm [sic] for complaints of feeling sick, throwing up and chills.  Although Offender Branum alleges he was seen and treatment was denied, no documentation was found to support that he was seen/evaluated for these symptoms at that time.  No Official Statements were obtained from LVN, Crawford addressing the offender's access to care for this timeframe. [sic]

Review of an Emergency Record dated 7/10/02 at 00:00 hours reflect B. Crawford, LVN, saw Offender Branum for increased temperature of 104.2.  Clinical documentation reflect a telephone order from Dr. Scamardo to give phenagren and Tylenol and to see the physician in the morning.  A follow-up appointment was scheduled with Dr. Scamardo at 4:45 on 7/10/02.  Clinical documentation reveals Dr. Scamardo evaluated Offender Branum on 7/10/02 at 5:08 in the morning.

The response provided at Step 1 reflects: ". . . There is no documentation regarding a July 8th encounter with any medical department employee. . ." [sic]  ". . . The patient's temperature was 101.8 not 104.7. . .". [sic] Both of these responses appear to be questionable as the Sick Call Log shows the offender attempted to access medical 7-8-02 and the 7-10-02 Emergency Record reflects a 104.2 temperature.

Offender Branum was evaluated for fever, rash, nausea and vomiting on 7/11/02.  The assessment reflects allergic reaction to sulfa versus sepsis.  He was subsequently scheduled with a provider 7/12/02.  Dr. Scamardo reflects resolving allergic reaction to sulfa on 7/12/02.

(Docket Entry No.130, Appendix D-1).  In October of 2002, plaintiff filed a Step 1 grievance complaining that the response to grievance number 2002203138 did not address his complaint against Nurse Howard.  (Docket Entry No.130, Appendix D-8).  Warden Carmona responded on November 8, 2002, that plaintiff had appealed grievance number 2002203138 to the regional level and it had been returned to him.  No further action was necessary.  (*Id.*).  He did not file a Step 2 grievance.

From these documents, it is clear that plaintiff's complaint in the Step One grievance differed from his complaint reported in the Health Services Report that Nurse Crawford refused to see him on July 8th before he received treatment for the allergic reaction.  Although plaintiff misstated the

date that he allegedly was denied treatment following the initial diagnosis of sulfa allergy, his grievance clearly states that he had seen Dr. Scamardo and been instructed to return to the clinic if his condition did not improve.  Because his medical records show that plaintiff was seen by Scamardo on July 10th, TDCJ-CID officials were given fair notice that plaintiff claimed that he had been refused treatment by a nurse the morning of July 10th and not July 8th.  Even though TDCJ-CID officials did not respond to plaintiff's complaint and focused only on the date that he alleged, plaintiff exhausted his administrative remedies regarding his alleged encounter with Nurse Howard on July 10th.

Plaintiff also claims that on August 5, 2002, an officer sent him to the medical clinic because the wound on his leg was draining onto his sock.  He claims that Nurse Howard refused to bandage or perform first aid treatment on the wound.  She told plaintiff she would refer him to a doctor. Plaintiff waited two days before he saw a doctor.  (Docket Entry No.20).

Plaintiff indicates that he filed grievances complaining that on August 1, 2002, Howard refused to treat his wounds, but he did not address the August 5th incident in the grievance.  (*Id.* at 14).  Therefore, plaintiff did not exhaust his August 5th claim of deliberate indifference against Howard.  Accordingly, plaintiff's August 5th deliberate indifference claim against Nurse Howard will be dismissed for failure to exhaust.

Next, plaintiff claims on April 21, 2003, he was given a latex catheter.  He complained, but was informed that a latex catheter, and not a non-latex catheter, had been ordered.  Plaintiff indicates that Nurse Howard would not tell him who ordered the latex catheter.  (Docket Entry No.20 at 32). Although plaintiff filed numerous grievances complaining about the use of a latex catheter (Docket Entry No.42), he did not file a grievance complaining of Nurse Howard's actions with respect to the

latex catheter.  (Docket Entries No.42, No.91, No.118, Appendix L).  Accordingly, he failed to exhaust this claim against Nurse Howard.

Finally, plaintiff claims on July 8, 2003, Nurse Howard denied him a pass to obtain a portable water jug, which other inmates carry.  Plaintiff indicates in his more definite statement that he filed a Step One grievance against Howard regarding her refusal to issue a water jug pass on July 8, 2003, but he was waiting on a response to the grievance.  (Docket Entry No.20, p.16).  Grievance records indicate that he filed Step One grievance number 2003209557 on July 20, 2003 (Docket Entry No.118, Appendix L at 71-73), but he did not file a Step Two grievance.  Therefore, plaintiff failed to exhaust his July 8, 2003, claim against Howard.  Accordingly, this claim will be dismissed for non-exhaustion.

In summary, plaintiff exhausted his claim that Nurse Howard refused medical treatment on July 10, 2002, but did not exhaust his claims that she was deliberately indifferent to his serious medical needs on August 5, 2002, April 21, 2003, and July 8, 2003.

### D. Deliberate Indifference to Serious Medical Need

Defendants move for summary judgment on the ground that plaintiff has failed to establish that defendants Howard, Scamardo, Fontenot, and Vatani were deliberately indifferent to his serious medical needs.  (Docket Entry No.118).

The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 811, 834 (1994).  The plaintiff must also show that prison officials acted or failed to act with deliberate indifference to that risk.  *Id.* at 834.  The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually

aware of the risk, yet consciously disregarded it.  *Id.* at 837, 839; *Lawson v. Dallas County*, 286 F.3d

257, 262 (5th Cir. 2002).  To state a claim of deliberate indifference, plaintiff must state facts

showing that defendants "refused to treat him, ignored his complaints, intentionally treated him

incorrectly , or engaged in any similar conduct that would clearly evince a wanton disregard for any

serious medical needs."  *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.

2001).  Mere negligence does not constitute a section 1983 cause of action.  *Estelle*, 429 U.S. at 106;

*Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) ("the subjective intent to cause harm cannot

be inferred from a ... failure to act reasonably").  An inmate's dissatisfaction with the medical

treatment he receives does not mean that he suffered deliberate indifference.  *Norton v. Dimazana*,

122 F.3d 286, 291-92 (5th Cir. 1997).

### 1. Licensed Vocational Nurse Cresia Howard

Defendants claim they are entitled to summary judgment on plaintiff's complaints against

Nurse Cresia Howard because plaintiff fails to show that Howard was aware of a substantial risk to

plaintiff's health and that she disregarded that risk.  (Docket Entry No.118).  The record reflects the

following with respect to plaintiff's claims against Nurse Howard:

Plaintiff wrote a sick call request on June 27, 2002, about pain in his testicle, leg, and back,

as follows:

> On 6-16-02, I had an accident in the shower, it is noted in my records.  I am
> experiencing severe pains in groin area.  Also I have a chronic vein problem (veinous
> statious[sic] or abcessing [sic] veins)[.]  I have a sore on my leg from it that is
> drainning [sic]/ leaking fluids.  I'd had an appointment about both of these problems
> on the Jester III Unit when I was transferred here.
>
> Also noted in my records from diagnostics is a nerve problem in my back.  Sleeping
> on this mattress has aggitated [sic] it to the point that I put the lumpy mattress on the
> floor and slept on the metal bunk because of the lumps in my mattress.  I need a foam
> crate mattress.

(Docket Entry No.5, Attachment, Docket Entry No.118, Exhibit J at 10).  Nurse Howard did not see plaintiff and did not schedule an appointment with a doctor.  Instead, she signed and dated the form on June 29, 2002, and wrote, "You have been seen and treated for skin problem.  You will have a follow up appt [sic] for chronic clinic.  Discuss egg crate then." (*Id.*).  Plaintiff claims he was not receiving medication for any condition at that time.  (Docket Entry No.1).

Howard attests by affidavit, and plaintiff's medical records reflect, that plaintiff had been seen by Doctors Naik and Largent on June 10, 11, 12, 16, 17, and 19, 2002, at the Jester III Unit for complaints of back pain, wound drainage, and testicle injury.  (Docket Entries No.124, Appendix I, Docket Entry No.118, Appendix J).  Plaintiff had been prescribed medication for his leg and pain medication for his testicle injury.  (Docket Entry No.118, Appendix J at 7).  On June 27, 2002, he was transferred to the Pack I Unit and scheduled for a medical appointment on July 11, 2002. (Docket Entry No.124, Appendix I).  Howard attests that since plaintiff's complaint on June 27, 2002, was not an emergency and he was already receiving medications for his injuries, she informed him that he would need to wait for his scheduled appointment with the doctor on July 11, 2002. (*Id.*).

Plaintiff responded with another sick call request, in which he complained that he was not seeking treatment of a skin problem but seeking treatment for his swollen testicle and the pain that he was experiencing in his groin.  He further complained that pus was flowing from the sore on his leg.  (Docket Entry No.118, Appendix J at 11).  In response to this sick call request, another nurse scheduled a sick call for plaintiff on July 2, 2002.  (*Id.*).

On July 2, 2002, plaintiff was seen by UTMB Tele-Med physician Oscar Boultinghouse, who prescribed Bactrim for the open wound on plaintiff's leg and referred him to the unit provider for his complaint regarding the swollen testicle.  (*Id.* at 12-15).

14

On July 3, 2002, plaintiff wrote another sick call request, complaining of pain in his testicle and that his leg was numb.  (*Id.* at 16).  Plaintiff indicated that although he had been seen by the Tele-Med doctor, his complaints about the swollen testicle and back pain were not given any attention.  (*Id.*)  Instead, he claimed that he had been told that the unit provider would see him for these problems.  (*Id.*)

Nurse Howard responded to this sick call request on July 5, 2002.  She stated that she would schedule an appointment with a doctor.  (*Id.*).  Plaintiff claims no appointment was ever made.  (Docket Entry No.1).  Howard attests that plaintiff's July 3rd sick call request was not received in the medical department until July 5th. (Docket Entry No.124, Appendix I).  Because plaintiff had seen Dr. Boultinghouse on July 2nd, and "was already undergoing treatment for his complaints and he was not suffering from a medical emergency, [she] instructed him that he should wait until his scheduled appointment on July 11, 2002."  (*Id.*)

Plaintiff filed another sick call request, complaining of the same.  (Docket Entry No.118, Appendix J at 17).  This time Nurse Levy responded on July 9th, stating that he had an appointment coming up and to wait for the lay-in.  (*Id.*).

Plaintiff claims he saw the doctor on July 9th, for other reasons.  (Docket Entry No.20).  His records, however, do not show that he saw a doctor on the 9th.  Instead, on July 10, 2002, plaintiff returned to the clinic because he had a severe reaction to Bactrim, the antibiotic that Dr. Boultinghouse had prescribed for the leg sore.  (Docket Entry No.118, Appendix J at 18-28).  About 6:30 a.m., he was given a pass to return to the clinic at 4:00 p.m. that day for a shot.  (Docket Entry No.5, attachment).

Plaintiff claims he returned to the clinic on July 10, 2002, around 10:30 a.m., with the medical pass for a shot.  He was being treated for a severe reaction to Bactrim and was still

experiencing the side effects of the drug.  He claims that when he arrived at the clinic Nurse Howard called him a liar and told him to leave the medical door and not to return until he got a lay-in.  She threatened to write a disciplinary report if he returned.  Plaintiff claims Howard instructed him to take the medication that he was having a reaction to.  (Docket Entries No.1, No.3, No.20).  As previously discussed, although plaintiff stated the wrong date in his grievances, the Court found that he exhausted his administrative remedies regarding this claim.

Howard attests that plaintiff's medical records show that he came to the medical department for an emergency visit around midnight on July 10, 2002, and was treated by LVN Crawford. (Docket Entry No.124, Appendix I).  Plaintiff was given one round of three shots during the visit and a pass to return later for another round.  (*Id.*).  Howard attests that she was not on duty on July 10, 2002, during plaintiff's emergency visit and did not seen him that day.  (*Id.*).

Plaintiff's medical records show that he returned to the clinic on July 11, 2002, for medical problems associated with the allergic reaction to Bactrim.  (Docket Entry No.118, Exhibit J at 29-33).  He was seen again on July 12, 2002, to resolve the allergic reaction to sulfa, epididymitis, and stasis ulcer.  (*Id*. at 35-39).

Plaintiff next claims that on August 1, 2002, Nurse Howard observed a sore on plaintiff's foot that was draining but refused to cover it with a bandage.  She told him that his appointment had been cancelled and to leave the clinic.  (Docket Entry No.1).  Plaintiff exhausted his administrative remedies through the TDCJ-CID grievance system with respect to this claim.  (Docket Entry No.5, Attachment).  In response to Step Two grievance number 2002215231, grievance investigator Rochelle McKinney responded,

> Clinical documentation reflects you were seen for painful lesions to your left foot and leg on 8/1/02.  Although the Nursing Assessment Protocol reflects no drainage noted, you were referred to a provider for evaluation.  A physician evaluated you on August 7, 2002.  Clinical documentation reflects you had developed drainage from

16

skin tear of left foot and ankle. A wound culture, dressing changes, and a follow-up appointment were ordered/scheduled. You were seen for your lower extremity concerns within seven calendar days, per Policy. No action is warranted through the grievance mechanism.

(Docket Entry No.5, Attachment). Plaintiff's Health Services Grievance Worksheet (Docket Entry No.91, attachment) shows "8/1/02 Protocol reflects; No drainage noted and refer to physician." (*Id.*).

Howard does not address the August 1, 2002, allegation in her affidavit and defendants did not submit a copy of plaintiff's medical records from that day. (Docket Entry No.118, Appendix L). Nevertheless, from this record, the Court finds the following facts to be undisputed. Plaintiff informed Nurse Howard by a sick call request on June 27, 2002, that he was experiencing severe pain in his groin from a recent documented injury and that he had other medical conditions that had been previously treated at the Jester III Unit. Howard did not address the pain issue in her response to the sick call request and told plaintiff to discuss his medical needs with medical staff at a upcoming appointment that had been previously scheduled. She did not think plaintiff's complaints constituted an emergency, she did not see plaintiff regarding his complaint of severe groin pain, and she did not schedule an appointment for him with a medical provider.

Thereafter, plaintiff filed another sick call request and a different nurse scheduled an appointment for him on July 2, 2002, with the UTMB Tele-Med physician. The Tele-Med physician prescribed medication for the open wound on his leg.

The next day, plaintiff filed another sick call request complaining that the UTMB Tele-Med doctor did not address his complaints regarding the back pain and swollen testicle. Nurse Howard responded that she would schedule an appointment with a medical provider. Plaintiff had already been scheduled an appointment with a unit provider on July 11, 2002.

17

On July 10, 2002, plaintiff was seen in the medical clinic for a severe reaction to the antibiotic prescribed by the UTMB Tele-Med physician.  He was seen the next two days by the unit medical provider for the same condition.

On August 1, 2002, plaintiff was seen in the medical clinic for painful lesions to his left foot and leg.  Nurse Howard did not dress or bandage the lesions.  Plaintiff was referred to a medical provider for evaluation.  A physician evaluated his condition on August 7, 2002.  He had developed drainage from a skin tear of his left foot and ankle.  A wound culture, dressing changes, and a follow-up appointment were scheduled.

From these undisputed facts, the Court finds that plaintiff has failed to show that Nurse Howard intentionally, with wanton disregard for his medical needs, refused to treat him, ignored his complaints, or treated him incorrectly.  At most, she misjudged the severity of his need for treatment and delayed treatment for his groin pain and leg sores by failing to schedule an appointment with a unit provider.  Such misjudgment does not constitute a section 1983 cause of action.  *See Wagner,* 227 F.3d at 324 ("the subjective intent to cause harm cannot be inferred from a ... failure to act reasonably").

The Court further finds that plaintiff has not alleged, and he fails to show, that Nurse Howard's failure to schedule appointments for his medical conditions or her alleged refusal to allow him in the clinic on July 10, 2002, resulted in substantial harm.  Deliberate indifference to serious medical needs may be manifested by prison medical providers in their response to the prisoner's needs in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  *Estelle*, 429 U.S. at 104-05.  Delay in obtaining medical treatment does not constitute deliberate indifference unless it is shown that the delay resulted in substantial

harm.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  Accordingly, defendants are entitled to summary judgment on plaintiff's complaints against Nurse Cresia Howard.

### 2. Dr. Luke Scamardo

Plaintiff claims Dr. Scamardo was deliberately indifferent to his serious medical needs on July 11, 2002, because Scamardo stated, without examining plaintiff, that plaintiff did not have a pinched nerve in his back.  (Docket Entries No.1, No.20 at 23).

Although plaintiff's medical records indicate that he submitted two sick call requests regarding back pain, there is no indication in the record that plaintiff complained to Dr. Scamardo about the pain.  Moreover, Dr. Scamardo attests by affidavit that plaintiff did not complain to him about any back pain on his July 11th appointment.  (Docket Entry No.124, Appendix E).  Instead, plaintiff complained only of nausea and vomiting, which Scamardo determined to be an allergic reaction to the drug Bactrim.  (*Id.*).  Scamardo further attests that he had no knowledge of plaintiff's alleged back pain; therefore, he "could not make any determination regarding the medical necessity of an eggcrate mattress."  (*Id.*)

Plaintiff's medical records support Dr. Scamardo's affidavit.  (Docket Entry No.118, Appendix J at 31-34).

Although the record shows that plaintiff filed several sick call requests regarding his back pain and requests for an eggcrate mattress, plaintiff fails to proffer any proof contravening the medical records or Dr. Scamardo's affidavit regarding Scamardo's treatment of plaintiff's medical needs on July 11, 2002.  Accordingly, the Court will grant defendants' motion for summary judgment on this ground.

### 3. Dr. Eugene Fontenot and Physician Assistant Lisa Vatani

As previously discussed, plaintiff claims a UTMB urologist ordered plaintiff a non-latex catheter because plaintiff is allergic to polyurethane.  Plaintiff maintains Dr. Fontenot noted the allergy in his medical records.  The unit medical director and nursing manager, however, expressed concern about the expense of a non-latex catheter.  On April 30, 2003, Dr. Fontenot had plaintiff sit in the air conditioned infirmary for thirty minutes with a latex glove on plaintiff's hand.  Fontenot noted on plaintiff's medical chart that plaintiff's hand was reddened but he was not allergic to latex. Plaintiff claims Fontenot was deliberately indifferent to his serious medical needs because he "experimented on plaintiff" and wrongfully denied him a non-latex catheter.  (Docket Entry No.20 at 31-32).

Plaintiff claims on May 30, 2003, Physician's Assistant Lisa Vatani, in partial contravention of orders from the UTMB urologist that plaintiff be given a non-latex catheter, ordered plaintiff a latex catheter instead of a non-latex catheter.  She further ordered the latex catheter to be changed only once a month, even though other inmates changed their latex catheters twice a month.

Plaintiff's unit medical records dated April 28, 2003, indicate that Dr. Fontenot noted that plaintiff "says he's allergic to latex by hx." (Docket Entry No.118, Appendix J at 48).  On April 29, 2003, Fontenot ordered a lay-in for plaintiff for April 30th, to discuss the possible allergy.  (*Id.* at 51).  On April 30th, Fontenot placed a latex glove on plaintiff for one hour and observed no adverse reaction.  (*Id.*).  Fontenot concluded plaintiff was not allergic to latex.  (*Id.*).  His treatment plan was "reassurance."  (*Id.*).

Fontenot explains in his affidavit that he addressed plaintiff's allergy complaint "by conducting an experiment to determine whether he actually had a latex allergy."  (Docket Entry No.124, Appendix F).  Fontenot further attests to the following, in pertinent part:

> I had Offender Branum wear a latex glove on his hand for one hour.  If he actually had a latex allergy, Offender Branum would have had an adverse reaction to the latex

20

from the glove.  There was no redness or adverse reaction on his hand after one hour, however, and I determined that Offender Branum does not have an allergy to latex. This procedure is standard protocol in the unit medical department and is used to determine allergic reactions to other materials such as wool.  If an inmate has an allergy to the particular material being tested, he will have an adverse reaction to that material.  I did not observe any redness, dermititis, or other adverse reaction to the latex on Offender Branum's hand following the experiment; therefore, he did not suffer from an allergy to latex and it was unnecessary to prescribe him a non-latex catheter.

(Docket Entry No.124, Appendix F).

Dr. Charles Adams, the Gulf Coast Medical Director for the Darrington, Ramsey, Wayne Scott, Clemens, and Terrell Units and the Carol S. Young Medical Facility of TDCJ-CID, attests that a non-latex catheter was not deemed a medical necessity in plaintiff's case; therefore, "it was proper for Dr. Fontenot to perform the allergy test on the inmate to determine whether the urologist's recommendation should be followed."  (Docket Entry No.124, Appendix H).  Adams further attests the allergy test that Dr. Fontenot performed "is a medically reasonable method for determining whether Offender Branum actually had a latex allergy.  When the inmate experienced no adverse reaction to the latex glove, it was appropriate for Dr. Fontenot and PA Vatani to continue Offender Branum on the latex catheter prescription."  (*Id.*).

Clinic notes dated May 15, 2003, indicate that plaintiff complained that he could not reinsert his catheter and that he insisted that he was allergic to latex.  (Docket Entry No.118, Appendix L at 57).  The nurse reinserted the catheter without difficulty and noted an immediate urine return of clear, yellow urine. (*Id.*).  The nurse reinforced that the latex test performed by physician indicated no allergic response to latex.  (*Id.*).

Tele-medicine clinic notes dated May 16, 2003, reflect that plaintiff's unit says he has no latex allergy because he wore a latex glove for one hour.  Plaintiff, however, states he has had a bad reaction, including bladder spasms and local reactions on skin.  "He is sure latex causing a problem."

21

(*Id.*, Appendix J at 60).  The Tele-Med physician noted that patient requires a non-latex foley catheter.  (*Id.* at 61).  The Tele-Med physician further recommended the catheter "be silicone non-latex due to patient's latex allergy."  (*Id.* at 62).  On May 30, 2004, plaintiff saw Physician's Assistant Lisa Vatani to discuss recommendations from Hospital Galveston concerning the latex catheter.  She noted a benign white mucous discharge from the urethra around the catheter but indicated that plaintiff had passed the latex allergy test last week.  She decreased the indwelling catheter changes from twice a month to once per month.  (*Id.* at 64).

In his response to the summary judgment motion, plaintiff complains that Dr. Fontenot is not licensed to perform such an experiment and that he failed to obtain plaintiff's consent before conducting such an experiment.  (Docket Entry No.130, Brief in Opposition to Defendant's Summary Judgment Motion, at 46-54).  The record, however, shows no evidence that Dr. Fontenot was deliberately indifferent to plaintiff's serious medical need for a non-latex catheter.  Instead, it shows that plaintiff and Tele-Med physicians, who relied on plaintiff's complaints of bladder and colon spasms and an alleged reaction to the bag attached to the catheter, thought plaintiff needed a non-latex catheter because he was allergic to latex.  Dr. Fontenot and Physician's Assistant Vatani, held a different opinion based on Dr. Fontenot's latex glove test.  A difference of opinion between medical professionals does not constitute deliberate indifference.  *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999) (finding no Eighth Amendment violation where prison physician failed to follow non-prison surgeon's advice to transfer inmate to another facility for physical therapy for his decubitus ulcers (bedsores), even though decubitus ulcers ultimately caused inmate's death).  Moreover, an inmate's disagreement with his medical treatment does not constitute deliberate indifference.  *Norton*, 122 F.3d at 292.  Plaintiff fails to show that Fontenot or Vatani acted with wanton recklessness to deprive him of proper medical care.  Accordingly, defendants are entitled

to summary judgment on plaintiff's deliberate indifference claim against Dr. Fontenot and Physician's Assistant Vatani.

### C. Conditions of Confinement

Defendants also maintain that plaintiff has failed to establish a claim of deliberate indifference to unsafe housing conditions against defendants Becker, Hearne, Chambless, and Karakos.  (Docket Entry No.118).

The Eighth Amendment imposes on prison officials a duty to provide humane conditions of confinement and to take reasonable steps to ensure the safety of those confined.  *Farmer v. Brennan*, 511 U.S. 825, 831-33 (1994).  To prevail on a claim that a prison official violated this duty, an inmate must demonstrate that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were conscious of that risk.  *Id.* at 834.  Second, the inmate must prove the prison official was deliberately indifferent to his health or safety by recklessly disregarding the risk by his acts or omissions.  *Id.* at 836.  The legal conclusion of deliberate indifference must rest on facts clearly evincing "obduracy and wantonness, not inadvertence or error in good faith."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The Supreme Court has explained that

> Wanton means reckless--without regard to the rights of others.... Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure.

*Smith v. Wade*, 461 U.S. 30, 39-40 n. 8 (1983) (quoting 30 American and English Encyclopedia of Law 2-4 (2d ed.1905) (footnotes omitted)).  Deliberate indifference cannot be inferred from negligence alone.  *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996).

Plaintiff claims the bench shower seat at issue in dormitory 14 is open-ended.  Because there was no necessity holder in the shower on dormitory 14, plaintiff placed his soap dish, shampoo, and razor on the outer part of the shower seat.  Plaintiff slid over the seat to retrieve the soap.  He was unaware that when he slid over, he caught his testicle between the slats in the seat.  He injured his testicle when he attempted to stand up.  (Docket Entry No.3).

Plaintiff maintains that Maintenance Supervisor Allen Chambless and Maintenance Craftsman Steve Karakos of the Jester III Unit were deliberately indifferent to his safety by failing to repair the bench seat in the handicapped shower in dormitory 14 because they knew of the danger the seat posed.  Plaintiff claims Chambless issued a work order sometime between April to June of 2002 to repair the handicapped shower seat on dormitory 15 and Karakos repaired the seat.  Plaintiff maintains that Chambless and Karakos knew the same problem existed on dormitory 14 but Chambless did not issue a work order to repair the shower and Karakos did not repair the problem.

Plaintiff claims that in 1995 or 1996 another inmate's testicle was caught between the slats on dormitory 13 of the Jester III Unit.  An incident report was filed at that time.  Plaintiff contends that based on the 1995 or 1996 report, defendants Chambless and Karakos, and former Warden Fred Becker should have seen that the safety hazard was investigated by the risk manager and plans devised to eliminate the risk.

Plaintiff filed a grievance regarding the safety of the seat and Regional Risk Management Coordinator Ruth Hearne denied it.  In her response dated August 8, 2002, she instructed plaintiff to place a towel on the bench seat before sitting on the seat.

Former Warden Fred Becker attests by affidavit he had been employed as Senior Warden of the Jester III Unit but retired seventeen days before plaintiff's accident.  (Docket Entry No.124, Appendix A).  Becker further attests that he was unaware of the incident report filed in 1995 or

1996, by another inmate, who allegedly suffered the same injury when his testicle was caught between the slats of a handicapped shower seat in dormitory 13.  Becker explains, "[t]housands of incident reports are filed by inmates each year at the Jester III Unit, and as such, only incident reports involving highly serious injury are forwarded to the warden.  I did not receive any incident reports regarding a testicle injury caused by the shower seats to Offender Branum or to any other inmate."  (*Id.*).

Ruth Hearne, the Unit Risk Manager, Safety Officer I for the Jester I, II, and III Units, attests that she did not have knowledge of the alleged 1995 or 1996 shower incident on dormitory 13 because she has only been employed in her current capacity since 1997.  (Docket Entry No.124, Appendix B).  She further attests that no medical reports were filed and forwarded to the risk management office regarding plaintiff's testicle injury but she did investigate the grievance that plaintiff filed regarding the allegedly defective shower seat.  Hearne claims she inspected the shower seats in the handicapped dormitories and "determined that the spaces between the wooden slats of the shower seats are narrow enough that it would be extremely difficult for an inmate to get a body part caught between the slats and cause injury.  The spaces between the slats are necessary for sanitation and allow the proper cleaning of the shower seats."  (*Id.*).  She determined that the incident involving plaintiff was caused by an unsafe act by the inmate and not by any unsafe condition of the shower seat.  (*Id.*).

Alan Chambless attests by affidavit that he is the Program Administrator II in the maintenance department of the Jester III Unit.  (Docket Entry No.118, Appendix C).  He denies knowledge of the alleged 1995-96 incident regarding the handicapped shower seat on dormitory 13.  Chambless was not employed by TDCJ-CID until January of 1998 and began his current position in the maintenance department in 2001.  (*Id.*).

Chambless further attests that he issued a work order sometime between April and June of 2002, to widen the slats in the handicapped shower seat on dormitory 15 but not because of any complaint, incident, or knowledge of testicle injuries caused by the gaps between the wooden slats on the seats.  (*Id.*).  Chambless explains that the slats on the shower seats on dormitory 15 are narrower than those on dormitories 13 and 14 and were widened so the SSI could clean between them.  (*Id.*).  Chambless attests, as follows:

> The change in that bench was not made in response to any safety hazards.  Therefore, a similar work order was not necessary for the rest of the shower seats in the handicapped dormitories.  In fact, given that the gaps on all the shower seats in the handicapped dormitories are fairly narrow, to widen the gaps even more, as Offender Branum claims we should have done for the seats in Dormitory 14, would only make it easier to get a body part caught between the slats and cause injury.

(*Id.*).

Defendant Steve Karakos, General Maintenance Technician IV at the Jester III Unit, attests by affidavit that he had no knowledge of the alleged 1995-96 incident that occurred on dormitory 13.  (Docket Entry No.118, Appendix D).  He further attests that the problems with the slats on the seats of the handicapped shower on dormitory 15, which he repaired between April and June of 2002, had nothing to do with any safety risk to inmates.  He attests that "[t]he gaps were widened on this bench simply because the Support Services Inmate who cleaned those shower stalls requested that the gaps be widened so that he could clean them better.  I widened the gaps in that bench by about one eighth of an inch so the SSI could clean between the slats, but the change in that bench was not made in response to any safety hazards."  (*Id.*).

Plaintiff presents no evidence to show that defendants were aware that the open-ended slats on the shower seat in the handicapped shower on dormitory 14 of the Jester III Unit posed a safety threat to inmates before plaintiff suffered his injury or that they deliberately disregarded the alleged threat that the open-ended seat posed.  Plaintiff agrees with defendant Hearne's assessment that "by

manufacturer design it would be virtually impossible for a body part to slip 'through' the gaps of the shower seats."  (Docket Entry No.130, Plaintiff's Brief in Opposition to Defendant's [sic] Motion for Summary Judgment, at 23).  He disagrees that an injury cannot occur from the open-ended slats.  (*Id.* at 23-24).

Plaintiff complains that he was denied discovery of TDCJ incident reports, a TDCJ policy handbook and an administrative order.  If available, plaintiff claims, he could show that defendants had a duty to inspect and repair the shower seat, and that they violated TDCJ policy by failing to discharge their duties.  (*Id.* at 19).  Even if defendants were aware of the 1995-96 incident on dormitory 13, there is no evidence that defendants or anyone else had determined that the spacing of the slats or the open ends of the seat constituted an unsafe condition of confinement or that defendants deliberately ignored the alleged hazard.  If as plaintiff complains, defendants failed to uphold their responsibilities pursuant to TDCJ-CID policy, he has shown that they are guilty of nothing more than negligence, which is not actionable under § 1983.  Accordingly, defendants' motion for summary judgment with respect to plaintiff's claims against defendants Becker, Hearne, Chambless, and Karakos is granted.

## III.  CONCLUSION

Based on the foregoing, the Court ORDERS the following:

1.      Defendants' motion for summary judgment (Docket Entry No. 118) is GRANTED.  Plaintiff's complaint is DISMISSED WITH PREJUDICE.

2.      Given the disposition of plaintiff's claims regarding his allergic reaction to latex in the present opinion, plaintiff's Second Request for Order to Show Cause and Temporary Restraining Order (Docket Entry No.122) is DENIED.

3.      Plaintiff's motion to file an amended complaint (Docket Entry No.133) is DENIED.

4.      Plaintiff's motion (objection) to defendants' expert witness (Docket Entry
        No.136) is noted and DENIED.

The Clerk will provide a copy of the order to the parties.

Signed at Houston, Texas on this 14th day of September, 2005.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE